NOTICE: All slip opinions and orders are subject to formal revision and are superseded by the advance sheets and bound volumes of the Official Reports. If you find a typographical error or other formal error, please notify the Reporter of Decisions, Supreme Judicial Court, John Adams Courthouse, 1 Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-1030; SJCReportersjc.state.ma.us

SJC-12747

IN THE MATTER OF A MINOR.

Middlesex.     November 4, 2019. - March 17, 2020.

Present:  Gants, C.J., Gaziano, Lowy, Budd, Cypher, & Kafker, JJ.


Practice, Civil, Civil commitment, Standard of proof, Appeal, Moot case, Findings by judge. Moot Question. Due Process of Law, Commitment.


        Petition for commitment for alcohol or substance use disorder filed in the Middlesex County Division of the Juvenile Court Department on February 19, 2019.

        The case was heard by Susan V. Oker, J.

        The Supreme Judicial Court granted an application for direct appellate review.


        Eva G. Jellison for the juvenile.
        Maura Healey, Attorney General, & Jesse M. Boodoo, Assistant Attorney General, for the Attorney General, amicus curiae, submitted a brief.
        Karen Owen Talley & Afton M. Templin, Committee for Public Counsel Services, for Committee for Public Counsel Services & others, amici curiae, submitted a brief.

GAZIANO, J. In this case, a sixteen year old high school student (juvenile) claims error in a Juvenile Court judge's decision to commit him for substance use disorder treatment pursuant to G. L. c. 123, § 35. His case requires us to decide whether and how the science of adolescent brain development recognized in Diatchenko v. District Attorney for the Suffolk Dist., 466 Mass. 655, 667-668 (2013), S.C., 471 Mass. 12 (2015), bears on a judge's decision to order commitment of juveniles for treatment. Additionally, the juvenile challenges whether appeals from commitment under this provision are moot after a respondent has been released; whether the evidence presented was sufficient in this case; and whether a judge deciding a petition for commitment under G. L. c. 123, § 35, must consider less restrictive alternatives to commitment.

For the reasons to be discussed, we conclude that the juvenile's order of commitment must be vacated.

Background. 1. Standards for commitment under G. L. c. 123, § 35. General Laws c. 123, § 35, sets forth the requirements and procedures by which an individual may be committed involuntarily for treatment of a substance use disorder. See Matter of G.P., 473 Mass. 112, 116-118 (2015). A "police officer, physician, spouse, blood relative, guardian or court official" may petition for an order of commitment under this provision. G. L. c. 123, § 35. Upon receipt of a

petition, the court shall schedule an immediate hearing and shall issue a summons to the person sought to be committed.  Id. "[I]f there are reasonable grounds to believe that such person will not appear and that any further delay in the proceedings would present an immediate danger to the physical well-being of the respondent," the court may issue warrants of apprehension, as necessary, to secure the individual's appearance for a hearing.  Id.  When the person appears, he or she has a right to counsel, and must be examined by a qualified physician, psychologist, or social worker.  Id.  See Matter of G.P., supra at 117.

To issue an order of commitment, the judge must find, by clear and convincing evidence, that (1) the person whose commitment is sought is an individual with an alcohol or substance use disorder, as defined by G. L. c. 123, § 35; and (2) there is a likelihood of serious harm as a result of the person's alcohol or substance use disorder, as defined in G. L. c. 123, § 1.  The statutory scheme presents three distinct paths by which a judge may find a "likelihood of serious harm."  G. L. c. 123, § 1.  A "likelihood of serious harm" exists if a judge finds:

> "(1) a substantial risk of physical harm to the person himself as manifested by evidence of, threats of, or attempts at, suicide or serious bodily harm; (2) a substantial risk of physical harm to other persons as manifested by evidence of homicidal or other violent

behavior or evidence that others are placed in reasonable fear of violent behavior and serious physical harm to them; or (3) a very substantial risk of physical impairment or injury to the person himself as manifested by evidence that such person's judgment is so affected that he is unable to protect himself in the community and that reasonable provision for his protection is not available in the community."

Id.  See Matter of G.P., 473 Mass. at 124-125.  This harm must be "imminent," which in this context means "a substantial risk that the harm will materialize in the reasonably short term -- in days or weeks rather than in months."  Id. at 128.

Because the Appellate Division of the District Court does not have jurisdiction to consider appeals in Juvenile Court cases, appeals from commitment orders issued by the Juvenile Court are heard by the Appeals Court.  See Matter of G.P., 473 Mass. at 123 n.17; Rule 11(b) of the Uniform Trial Court Rules for Civil Commitment Proceedings for Alcohol and Substance Use Disorders, Mass. Ann. Laws Court Rules, Trial Court Rules, at 997 (LexisNexis 2018) (uniform rules).  Upon request, the Appeals Court "shall expedite consideration of any appeal." Rule 11(b) of the uniform rules.

2.  The juvenile's commitment hearing.  In February 2019, the juvenile's mother petitioned the Juvenile Court under G. L. c. 123, § 35, to commit her son for involuntary treatment.  Her affidavit asserted that the juvenile was putting himself in danger by using and selling Xanax.  When he was apprehended

pursuant to a warrant, the juvenile was found with a large bottle of Xanax pills, and a second bottle of crushed Xanax, on his person.

Prior to the issuance of the warrant, the mother testified that she recently had discovered that the juvenile was still using Xanax (notwithstanding his participation in earlier treatment programs).  By reading her son's text messages, she gleaned that, on at least one recent occasion, he had been unable to remember events of the previous evening due to drug use.  The mother sketched for the court the juvenile's treatment history, which included multiple placements in residential treatment, one prior commitment under G. L. c. 123, § 35, and January enrollment in a recovery high school, a school specially designed for youth with substance use disorders.  She stated that, on some unspecified date, the juvenile had been found sleeping on a bench at 2 A.M., and that he sometimes turned off his cellular telephone to avoid being found by his mother.  On this evidence, the judge ordered a warrant of apprehension.

When the juvenile arrived at court, Janice Hrabovszky, a Juvenile Court clinician, interviewed him and his mother.  She also contacted the juvenile's school clinician by telephone.  Hrabovszky concluded that the juvenile had a substance use disorder.  She based this determination on her interview with

his mother, his history of drug treatment, and his multiple positive drug tests, as reported by the school clinician.

Additionally, Hrabovszky opined that the juvenile's substance use disorder put him at risk of harm. She pointed to accounts by his mother that the juvenile had ridden in automobiles with unlicensed drivers who were driving while under the influence, an instance where the juvenile became verbally aggressive toward school staff over confiscated property, and an overdose that had occurred "a number of years ago" as a result of mixing Xanax and alcohol. Hrabovszky viewed that overdose as relevant to the need for commitment because the juvenile's mother had found open bottles of alcohol in his room and he had been carrying a large bottle of Xanax on his person when he was arrested. Hrabovszky also noted the concern, conveyed by the juvenile's mother, that the Xanax the juvenile had had in his possession was not pharmaceutically produced, and that it potentially could be laced with toxic substances. The basis for the mother's knowledge about the producer of the Xanax was unclear from Hrabovszky's testimony.

The juvenile's mother stated that she generally was able to tell when her son was using drugs (she estimated her own accuracy at ninety-five percent certainty), and that she had had him drug tested repeatedly, either at home, at school, or through the court. When asked what behaviors derived from his

substance use put the juvenile at risk of harm, the mother pointed to his increased verbal aggression and missed curfews. She also noted that the pills were "not actual Xanax . . . not the legit ones."  When the judge inquired further about this concern, the mother mentioned a newspaper article she had read that indicated that "pressed" (not legitimately manufactured) pills might be laced with other substances.  The mother also repeated her concern that the juvenile had mixed Xanax with alcohol, but did not specify a particular occasion on which she knew he had done so, apart from the overdose several years earlier.  On cross-examination, the mother explained that, while she had not seen her son use Xanax and alcohol together (or either of them separately), she had found open beer bottles in his room.  She inferred the mixing of substances because, "I know that he's admitted that he's drinking, and then he's also admitted that he's taken the Xanax.  So . . . ."

The juvenile denied currently mixing drugs and alcohol.

On this evidence, the judge ordered the juvenile committed for ninety days for treatment.

Discussion.  We address three sets of issues.  First, we consider whether appeals from commitment orders under G. L. c. 123, § 35, become moot when a committed individual is released.  We then turn to the question of the evidence in this case, and examine both how the science of adolescent brain

development should inform a judge's consideration of a petition to commit a juvenile, and whether there was sufficient evidence to order commitment here. Finally, we consider the juvenile's due process arguments.

1. Mootness. "Ordinarily, litigation is considered moot when the party who claimed to be aggrieved ceases to have a personal stake in its outcome." Commonwealth v. Dotson, 462 Mass. 96, 98 (2012), quoting Blake v. Massachusetts Parole Bd., 369 Mass. 701, 703 (1976). Because individuals committed under G. L. c. 123, § 35, have a personal stake in litigating a wrongful commitment, even after release from confinement, we conclude that appeals from an order of commitment pursuant to G. L. c. 123, § 35, are not moot.[1]

When considering other statutory provisions that allow involuntary civil commitment, we have determined that the continuing stigma of a potentially wrongful commitment alone sufficed to defeat a claim of mootness. See Matter of F.C., 479 Mass. 1029, 1029-1030 (2018) (appeals from expired or terminated involuntary commitment and treatment orders under G. L. c. 123, §§ 7, 8, and 8B, not moot because "[a]t the very least, a person who has been wrongfully committed or treated involuntarily has a

---

[1] To the extent we previously have indicated that an appeal from an order of commitment became moot upon the individual's release, see, e.g., Matter of G.P., 473 Mass. 112, 113 (2015), we now conclude otherwise.

surviving interest in establishing that the orders were not lawfully issued, thereby, to a limited extent, removing a stigma from his name and record" [quotation and citation omitted]). See Pembroke Hosp. v. D.L., 482 Mass. 346, 351 (2019) (same for appeals from commitment under G. L. c. 123, § 12); Matter of M.C., 481 Mass. 336, 343 (2019) (same for involuntary commitment under G. L. c. 123, § 16).

In addition to any continuing stigma, involuntary commitment for substance use disorder treatment implicates other legal interests. For example, as was the case here, a previous commitment has been considered evidence of a substance use disorder, potentially making it easier for an individual to be recommitted for a subsequent period of treatment, sometimes months or years later. Moreover, under G. L. c. 123, § 35, the court is required to submit the individual's personally identifiable information, including name, Social Security number, and date of birth to the Department of Criminal Justice Information Services. For an adult, absences from work due to commitment may result in the loss of employment, leading to ongoing economic detriment and potentially increasing the risk of homelessness. For a student, absences from class may have an impact on the student's academic achievement, advancement to the next grade level, likelihood of dropping out of school, or chance of admission to postsecondary school programs -- harms

that continue beyond commitment.  Just as with other civil mental health commitments, an individual wrongfully committed for involuntary substance use treatment and then released also retains an interest "in establishing, after discharge, that the order[] by which [he or she was] committed [was] unlawful, thereby, to a limited extent, removing a stigma from [his or her] name and record" (quotation and citation omitted).  See Pembroke Hosp., 482 Mass. at 351.[2]

Because these ongoing consequences implicate an individual's privacy, reputation, and future liberty, they also support the conclusion that an individual has a personal stake in the outcome of litigating an appeal from an order of commitment, even after the individual is released.  Therefore, appeals from an order of commitment pursuant to G. L. c. 123, § 35, are not moot solely because the individual is no longer committed.

2.  Evidence necessary for commitment.  a.  The role of youth in substance use disorder commitment hearings.  The juvenile argues that if a judge does not take into account the lower "baseline" for impulsiveness, self-control, and judgment that is developmentally typical for juvenile brains, the judge

---

[2] In addition, commitment under G. L. c. 123, § 35, makes an individual ineligible to hold a license to possess a firearm for a minimum of five years, and possibly longer, as the individual must petition successfully for relief from ineligibility.

erroneously may order a juvenile committed for youthful misbehavior alone.  The juvenile asserts that impulsiveness, incomplete self-control, and lack of judgment -- known hallmarks of youth brain development -- may be confused with symptoms of substance use disorder, resulting, as he argues happened here, in improper commitments.

As the United States Supreme Court and this court have recognized, the science of adolescent brain development attests to the ways in which a "transient rashness, proclivity for risk, and inability to assess consequences" are hallmarks of young, developing brains.  Miller v. Alabama, 567 U.S. 460, 472 (2012).  See Diatchenko, 466 Mass. at 667-668.  This research is relevant to petitions to commit a juvenile under G. L. c. 123, § 35, because, in determining whether an individual meets the relevant statutory definitions, a judge is required to assess an individual's judgment, self-control, and social functioning, precisely those areas of juvenile brains that are recognized as underdeveloped.  See G. L. c. 123, § 1 (defining third prong of "likelihood of serious harm" with reference to whether very substantial risk is created because "[a] person's judgment is so affected" by substance use disorder); G. L. c. 123, § 35 (defining alcohol and substance use disorder, in part, by reference to whether use substantially interferes with

individual's social functioning and whether that individual has lost power of self-control over substance).

In this case, the juvenile contends that the judge, without finding any nexus with the juvenile's substance use disorder, impermissibly relied on the fact that the juvenile missed curfew, spent time with reckless peers, sold Xanax, and yelled at school staff in support of a finding of substance use disorder. This behavior, the juvenile argues, may be grounds for parental or school discipline. It possibly could support a petition for a child in need of services, or even delinquency proceedings. Without a nexus to the likelihood of serious harm resulting from a substance use disorder, however, rebellious or difficult teenage misbehavior cannot support a petition for commitment under G. L. c. 123, § 35.

Considering the implications of teenage brain science in determining whether commitment is necessary for substance use treatment does not create two different standards for the commitment of adults and the commitment of juveniles. See G. L. c. 123, § 35 (no distinctions in standards for juveniles and adults). Rather, taking into account a juvenile's youth necessarily is required as part of the fact-intensive, individualized assessment these petitions demand. See Matter of G.P., 473 Mass. at 125 ("the assessment of risk is a probabilistic one, and necessarily must be made on the basis of

the specific facts and circumstances presented").  We agree with the juvenile, however, that, in some cases, difficulties in distinguishing typical adolescent lapses in judgment or self-control from those driven by substance use disorder may make a judge's already difficult task more challenging in juvenile commitment proceedings.  In those cases, a judge should make clear that his or her decision was founded on a causal nexus between a likelihood of serious harm and substance use disorder, rather than developmentally typical adolescent misbehavior.

b.  Sufficiency of the evidence.  The juvenile maintains that, even had the judge properly focused her inquiry on the causal relationship between an alleged substance use disorder and the possible resulting likelihood of serious harm, the evidence here was insufficient to sustain his commitment.  We agree.

i.  Standard of review.  The hearing judge is in the best position to weigh the evidence, assess the credibility of witnesses, and make findings of fact; a reviewing court accepts these findings unless they are clearly erroneous.  See Matter of A.M., 94 Mass. App. Ct. 399, 401 (2018), citing G.E.B. v. S.R.W., 422 Mass. 158, 172 (1996).  When considering a challenge to the sufficiency of the evidence at an evidentiary hearing, we "scrutinize without deference the propriety of the legal criteria employed by the [motion] judge and the manner in which

those criteria were applied to the facts." Matter of A.M., supra, quoting Iamele v. Asselin, 444 Mass. 734, 741 (2005). See Matter of G.P., 473 Mass. at 129-130 (deferring to judge's subsidiary findings, but reviewing without deference legal conclusion as to whether "a substantial risk of serious harm to others" was met).

ii. Substance use disorder. In order to commit an individual under G. L. c. 123, § 35, a judge first must find that the individual has a substance use disorder, an alcohol use disorder, or both. Both disorders are marked by "chronic or habitual consumption" to the extent that using the substance either "substantially injures" the individual's health or "substantially interferes with the person's social or economic functioning," or results in the individual having "lost the power of self-control over the use" of the substance. See G. L. c. 123, § 35.

The judge found that the juvenile here had both a substance use disorder and an alcohol use disorder. While no court condones underage drinking, it is essential for judges to distinguish between a juvenile's illicit alcohol use or experimentation, on the one hand, and alcohol use disorder, on the other. The key to that distinction, as indicated in the statutory definition, is chronic or habitual use to such an extent that it results in a "substantial injury" to the

juvenile's health or social functioning, or a loss of the power of self-control over his or her consumption of alcohol.  See G. L. c. 123, § 35.  At the hearing, the evidence of the juvenile's alcohol use came from his mother.  She testified, "It's been numerous times, now, that I've found alcohol in his room. . . .  Open beers, right next to his bed."  While this situation understandably is concerning, finding open beer bottles in a teenager's room, even in circumstances indicating consumption on week nights, does not suffice to demonstrate that the juvenile has an alcohol use disorder.[3]  The fact that the juvenile consumed beer, by itself,[4] does not show substantial injury to the juvenile's health or social functioning stemming directly from chronic or habitual alcohol consumption, or that the juvenile attempted to stop drinking but could not do so. "Most teens do not escalate from trying drugs to developing an addiction or other substance use disorder . . . ."  National Institute on Drug Abuse, Principles of Adolescent Substance Use Disorder Treatment:  A Research-Based Guide, at 4 (Jan. 2014).

---

[3] Contrast Matter of A.R., Mass. App. Div., No. 18-ADMH-124SO (Dist. Ct. Dec. 18, 2018) (alcohol use disorder found, where respondent recently had been fired for drinking at work, and testimony indicated that he consumed between two and ten drinks every day).

[4] The mother testified at one point that she had seen two bottles of beer in the juvenile's room, and at other points that she had seen beer in the juvenile's room on multiple occasions.

We conclude that the record is inadequate to support a finding of an alcohol use disorder.

The judge's finding of a substance use disorder is on firmer footing.  While evidence of treatment history must be evaluated carefully to ensure that it bears upon an individual's current condition, treatment history often may be relevant in these proceedings.  Compare Matter of R.G., Mass. App. Div., No. 19-ADMH-30NO (Dist. Ct. Sept. 25, 2019) (long treatment history was considered and properly combined with recent evidence to find ongoing alcohol use disorder), with Matter of I.M., Mass. App. Div., No. 19-ADMH-36NO (Dist. Ct. June 5, 2019) (commitment under G. L. c. 123, § 35, from two years earlier properly was disregarded when unconnected to evidence of continuing alcohol use disorder).  Here, Hrabovszky, the court clinician, interviewed the juvenile and his mother, and spoke with a school clinician by telephone; on this evidence, she concluded that the juvenile had a substance use disorder.  Although much of her stated reasoning was based on the fact of the juvenile's prior treatment, Hrabovszky did conduct her own independent evaluation.  Moreover, the juvenile's voluntary treatment history, September commitment under G. L. c. 123, § 35, and recent enrollment at a specialty school for juveniles with substance use disorders support the inference that other

clinicians previously had evaluated him and also had come to the conclusion that he had a substance use disorder.

Granted, on this record, the presence of a substance use disorder is not beyond dispute. Apart from the incident his mother learned of from the text messages, there was little direct evidence that the juvenile's consumption of Xanax was threatening his health or impairing his social functioning at work or at school.[5] Nevertheless, it was not clearly erroneous to find, based on his treatment history and continuing drug use, that the juvenile had a substance use disorder.

iii. <u>Likelihood of serious harm</u>. The judge did not specify which of the three disjunctive definitions she used in finding a likelihood of serious harm. See G. L. c. 123, § 1. There was no evidence that the juvenile was suicidal (first prong); nor was there any evidence that the juvenile was homicidal or exhibiting other violent behavior (second prong). Thus, the judge must have made her finding based on the third prong, which requires "a very substantial risk of physical

---

[5] The juvenile was attending school, where he had friends, and had a job at a grocery store, where his supervisor reported only one unexcused absence. His mother stated that this absence was on a Saturday when the juvenile was at home and said that he did not feel like going to work. The conflicts at school, which were of serious concern to his mother, appear to have derived from the juvenile's alleged drug distribution and, specifically, a conflict involving a particular transaction with another student, rather than from his own drug use.

impairment or injury . . . as manifested by evidence that [a respondent's] judgment is so affected that he is unable to protect himself in the community and that reasonable provision for his protection is not available in the community."  G. L. c. 123, § 1.  In this case, the only evidence in the record that might support a finding of very substantial and imminent harm are two concerns of the juvenile's mother:  the evidence suggesting (1) that the Xanax in the juvenile's possession was adulterated with a dangerous additive, and (2) that the juvenile was consuming alcohol and Xanax together.

As to the possibly adulterated Xanax, the mother testified that, when she had had the juvenile's Xanax tested at some prior point, she had learned it was not pharmaceutically produced; she did not indicate that this testing revealed the presence of dangerous additives.  Instead, she mentioned a newspaper article discussing cases of tainted pills in Stoneham.  While adulterated drugs might pose a significant risk to drug users, mere reports of tainted drugs somewhere in the Commonwealth, without any specific nexus to the case before the court, are insufficient to support the legal conclusion that there was an imminent and "very substantial risk of physical impairment" to the juvenile.  See G. L. c. 123, § 1.

As to the concern that the juvenile was mixing alcohol and Xanax, the mother stated that, although she had not observed him

doing so, the juvenile had admitted to having mixed alcohol and Xanax on some unspecified prior occasion. She could not remember the last time he had admitted to having mixed these substances. While there was evidence that the juvenile was consuming both substances (open beer bottles in his room, and a positive drug test for benzodiazepines from the school), when the mother was pressed on cross-examination, it became clear that the asserted mixing essentially was an inference by her. Hrabovszky testified that the juvenile denied to her that he was consuming beer and Xanax at the same time. The judge of course was free to discredit the juvenile's reported statement. Nonetheless, the mere possibility that the juvenile was mixing the substances does not rise to the level of an imminent and "very substantial risk of physical impairment or injury." G. L. c. 123, § 1. Compare Matter of A.M., 94 Mass. App. Ct. at 402-403 ("the possibility that [A.M.'s] illicit drug use in combination with an unspecified prescribed medication regimen that has mere potential to be life threatening [does not rise] to 'imminent serious harm'"), with Matter of C.R., Mass. App. Div., No. 19-ADMH-48SO (Dist. Ct. Sept. 25, 2019) (commitment was appropriate where there was reliable testimony that individual had received Vivitrol shot, that she had continued to drink heavily on Vivitrol as recently as three days prior to hearing, and that Vivitrol and alcohol can be fatal when mixed).

Setting aside the evidence of youthful recklessness unrelated to a substance use disorder, we conclude that the evidence in the record that properly could have shown a connection between the juvenile's substance use disorder and a likelihood of imminent serious harm -- evidence that the Xanax was tainted or that the juvenile had consumed it with alcohol -- was insufficient to support a finding of imminent and "very substantial risk of physical impairment or injury."  G. L. c. 123, § 1.  The finding therefore must be reversed, and the order of commitment vacated and set aside.

3.  Due process constraints in substance use disorder commitment hearings.  In addition to challenging the sufficiency of the evidence in his case, the juvenile argues that due process requires additional safeguards at hearings pursuant to G. L. c. 123, § 35.  He maintains that a judge must make more specific and substantial subsidiary findings than the judge made here and that, at all commitment hearings under G. L. c. 123, § 35, a judge must consider less restrictive alternatives to commitment.

a.  Sufficiency of factual findings.  The judge's findings at the end of the hearing were terse:  "I do find, by clear and convincing evidence, . . . that you are an individual with an alcohol and substance abuse disorder.  And that the failure to commit you would create a likelihood of serious harm.  And that

there is no less restrictive alternative."  The juvenile contends that these limited findings were insufficiently detailed to comport with the requirements of due process.  While the findings met all that is required by the explicit statutory language,[6] we agree that due process mandates something more.

"[T]he constitutional demands of due process" dictate that a "statement of findings and reasons, either in writing or orally on the record, is a minimum requirement where a defendant faces a loss of liberty."  Brangan v. Commonwealth, 477 Mass. 691, 708 (2017).  See id. at 707 (due process requires factual findings demonstrating consideration of relevant bail factors); Commonwealth v. Hartfield, 474 Mass. 474, 484 (2016), citing Commonwealth v. Durling, 407 Mass. 108, 113 (1990) (due process requires written or oral statement that illuminates "the evidence relied upon and the reasons for revoking probation"); Doucette v. Massachusetts Parole Bd., 86 Mass. App. Ct. 531, 539

---

[6] The language of G. L. c. 123, § 35, places minimal requirements on a judge's findings.  A judge must find "that such person is an individual with an alcohol or substance use disorder and there is a likelihood of serious harm as a result of the person's alcohol or substance use disorder."  G. L. c. 123, § 35.  Second, "[t]he court, in its order, shall specify whether such commitment is based upon a finding that the person is a person with an alcohol use disorder, substance use disorder, or both."  Id.  The uniform rules do not require more elaborate factual findings.  See Rules 6(a), 8(a) of the uniform rules, supra at 992, 994-995.  Rule 7(a) of the uniform rules, supra at 993, contains the only other required finding:  that a judge may rely on hearsay evidence "only if the judge finds that it is substantially reliable."

(2014) (same for revocation of parole).  Cf. <u>Mendonza</u> v.
<u>Commonwealth</u>, 423 Mass. 771, 775 (1996) (indicating that written
findings of fact and reasons for detention are statutorily
mandated by G. L. c. 276, § 58A [4], in order to detain
individual before trial on grounds of dangerousness).[7]

This minimum requirement applies here, for "[a]n order of
commitment under [G. L. c. 123, § 35,] results in a substantial
curtailment of liberty."  <u>Matter of G.P.</u>, 473 Mass. at 126.  The
judge's recitation of statutory standards, while meeting the
minimum explicitly stated requirements in the statute, does not
set forth findings sufficient to elucidate which subsidiary
facts she relied upon in reaching her conclusions.

Therefore, in hearings pursuant to G. L. c. 123, § 35, a
judge must make clear, in writing or orally on the record, the
evidence he or she credited in support of the legal conclusion
that the respondent had a substance or alcohol use disorder, as
well as the evidence supporting an imminent likelihood of

---

[7] When other fundamental rights similarly are burdened, we
have required that judges make clear the evidence they relied
upon and the reasoning they undertook to reach their
conclusions.  See <u>Doe, Sex Offender Registry Bd. No. 496501</u> v.
<u>Sex Offender Registry Bd.</u>, 482 Mass. 643, 657 (2019) (requiring
express findings by Sex Offender Registry Board that support
assigned sex offender classification level); <u>Adoption of Yale</u>,
65 Mass. App. Ct. 236, 239 (2005), quoting <u>Custody of Eleanor</u>,
414 Mass. 795, 799 (1993) (for termination of parental rights,
"[c]areful factual inspection and specific and detailed
findings" by trial judge are required in order to "demonstrate
that close attention has been given the evidence").

serious harm stemming from that disorder.  Relevant facts tend to show the reasons for a finding of the existence of a disorder, as opposed to use of a substance, as well as the likelihood of the harm, its imminence, its seriousness, and the nexus between the harm and the underlying substance or alcohol use disorder.

Additionally, where a judge relies on hearsay, the judge's written or oral findings should indicate why the judge found that hearsay reliable.  See rule 7 of the uniform rules, supra at 993 (in proceedings under G. L, c. 123, § 35, where hearsay may be admissible, it "may be relied upon only if the judge finds that it is substantially reliable").  In Matter of G.P., 473 Mass. at 121-122, we allowed the use of hearsay evidence at hearings on commitments for substance use disorder treatment, only so long as the judge found that evidence to be substantially reliable.  See id. at 122 (because "hearsay evidence may well play an extremely significant role in these hearings," it is critical that judge "ensure[s] that any hearsay on which he or she relies is 'substantially reliable'").  For probation revocation hearings, in which substantially reliable hearsay likewise is admissible, we have required judges to state explicitly the reasons supporting the reliability of any hearsay they rely upon.  See Hartfield, 474 Mass. at 485 ("Even if not required by court rule, we conclude that, where a judge relies

on hearsay evidence in finding a violation of probation, the judge should set forth in writing or on the record why the judge found the hearsay evidence to be reliable").

The same conclusion is compelled here.  As part of the more detailed findings that due process requires, a judge relying on hearsay evidence at substance use disorder commitment hearings should make clear, in writing or on the record, what specific indicia of reliability led him or her to conclude that the hearsay evidence supporting the determination that commitment was necessary is substantially reliable.[8]

The requirement that a judge make explicit those findings the judge necessarily must have made implicitly need not impose a significant burden on the hearing judge.  In Matter of G.P., 473 Mass. at 122, we recognized "the extremely short time frame" in which hearings under G. L. c. 123, § 35, take place.  By allowing these findings to be made orally on the record, and therefore to be made relatively quickly, we continue to

---

[8] In Matter of G.P., 473 Mass. at 122, we pointed to Commonwealth v. Patton, 458 Mass. 119, 132-133 (2010), in which we identified a nonexclusive list of factors for judges to consider in determining whether hearsay is reliable, namely, the level of factual detail (rather than generalized and conclusory assertions); whether the statements were made based on personal knowledge and direct observation; whether the statements were corroborated; whether the statements were made under circumstances that support the veracity of the source; and whether the statements were made by disinterested witnesses. See Commonwealth v. Durling, 407 Mass. 108, 121 (1990).

acknowledge the "practical considerations" faced by judges and all parties in hearings under G. L. c. 123, § 35.  See Matter of G.P., supra.

b.  Consideration of less restrictive alternatives.  In Matter of G.P., 473 Mass. at 129 n.24, we left open the question whether, as the juvenile contends, due process requires a judge to consider less restrictive alternatives in all commitment hearings for substance use disorder treatment.  Faced squarely with that question here, we answer affirmatively.

"The Fourteenth Amendment to the United States Constitution and arts. 1, 10, and 12 of the Massachusetts Declaration of Rights establish a fundamental right to liberty and freedom from physical restraint that cannot be curtailed without due process of law."  Brangan, 477 Mass. at 702.  See Pembroke Hosp., 482 Mass. at 347; Matter of E.C., 479 Mass. at 119 ("The right of an individual to be free from physical restraint is a paradigmatic fundamental right" [citation omitted]).  Laws that directly infringe on fundamental rights, such as liberty from constraint, are subject to strict scrutiny.  See Brangan, supra at 703; Commonwealth v. Libby, 472 Mass. 93, 96-97 (2015); Commonwealth v. Weston W., 455 Mass. 24, 30 (2009).  "To pass the strict scrutiny standard, the [law] must be narrowly tailored to further a legitimate and compelling governmental interest and be

the least restrictive means available to vindicate that interest." Weston W., supra at 35.

The juvenile argues that only after less restrictive alternatives have been considered may commitment be deemed the least restrictive means by which to vindicate the government's interest.[9] The argument has merit. Because these cases are intensely fact-specific, there is no way to ensure that commitment is the least restrictive means of vindicating the government's interest, unless and until a judge has considered less restrictive alternatives in each case. For the statute to survive strict scrutiny, this inquiry must be undertaken.

We reached a similar conclusion in Commonwealth v. Nassar, 380 Mass. 908, 917-918 (1980). There, we required judges to find that no less restrictive alternatives to civil commitment were appropriate before authorizing commitment pursuant to G. L. c. 123, §§ 7-8 (civil commitment of mentally ill person whose release would create likelihood of serious harm to individual or others). While that holding did not rest explicitly on grounds of substantive due process, its reasoning closely mirrored strict scrutiny principles. Nassar, supra ("we think it natural

---

[9] The parties do not dispute that the government has a compelling and legitimate interest in protecting its residents from the often tragic consequences of substance use disorder. In addition, because it is not contested here, we assume without deciding that G. L. c. 123, § 35, is narrowly tailored.

and right that all concerned in the law and its administration should strive to find the least burdensome or oppressive controls over the individual that are compatible with the fulfilment of the dual purposes of our statute, namely, protection of the person and others from physical harm and rehabilitation of the person").

While Nassar, 380 Mass. at 917-918, was decided on statutory grounds, here we reach the constitutional question. For G. L. c. 123, § 35, to be constitutional as applied, the hearing judge must find, by clear and convincing evidence, that there are no appropriate, less restrictive alternatives that adequately would protect a respondent from a likelihood of imminent and serious harm.

To be appropriate, a less restrictive alternative need not eliminate all risk to a respondent. Rather, the proper focus is on whether there are any viable, plausibly available options that bring the risk of harm below the statutory thresholds that define a likelihood of serious harm ("substantial risk" for prongs one and two, and "very substantial risk" for prong three). See Matter of G.P., 473 Mass. at 128-129 (discussing "quantum of risk" necessary to meet standards of G. L. c. 123, § 1).

For example, in this case the judge found a likelihood of serious harm. She then weighed commitment against the voluntary

program that the juvenile had been scheduled to start within one week.  She concluded that, because she did not have confidence the juvenile actually would attend that program, it did not serve adequately to reduce the risk of harm.  This determination was within her discretion and satisfies the requirement that due process imposes.

As a practical matter, in evaluating less restrictive alternatives, judges may seek guidance from the qualified physicians, psychologists, and social workers who already are required to testify in these cases.  Where, as here, the respondent is accessing, or may soon access, various forms of treatment and services, the respondent's counsel may argue their sufficiency to mitigate risk.  In such cases, consideration of less restrictive alternatives should evaluate the ways in which involuntary commitment can disrupt ongoing treatment efforts, as well as connections to the community and familial relationships. Particularly for juveniles, supportive relationships with family and community have been deemed protective against future substance use.  See Section 35 Commission Report, at 6 (July 1, 2019).[10]  Ultimately, in crafting this requirement, our intention

---

[10] The Section 35 Commission was established in 2018, see St. 2018, c. 208, § 104, to study "the efficacy of involuntary inpatient treatment for non-court involved individuals diagnosed with a substance use disorder."  It is chaired by the Secretary of Health and Human Services, and is staffed by representatives from numerous specifically identified private entities and

is to ensure, in accordance with the principle of due process, that involuntary commitment remains a viable, but carefully circumscribed, tool of last resort.  See id. (recommending expansion of easily accessed, "low-threshold," community-based treatment models and reservation of commitment for most severe cases).[11]

Conclusion.  Because the juvenile was committed on insufficient evidence, the finding of a substance use disorder creating an imminent and very substantial risk of harm must be reversed, and the order of commitment must be vacated and set aside.  The matter is remanded to the Juvenile Court for entry of an order consistent with this opinion.

So ordered.

---

professional groups involved in substance use treatment or public health, as well as representatives from a number of State agencies and members of the Legislature.  See Section 35 Report, at 35 (July 1, 2019) (Appendix A).

[11] In its July 2019 report, the Section 35 Commission presented seventeen recommendations to the Commonwealth.  Its top recommendation was that the Commonwealth

> "should expand development of low-threshold, treatment on demand models, including harm reduction interventions in community-based settings, immediate access to medication-assisted treatment (MAT) and expansion of bridge clinics, addiction consult services, outreach and engagement programs, post-overdose intervention programs, syringe services programs, and family intervention programs."

Section 35 Commission Report, supra at 6.  Thirteen of the recommendations were adopted.  Id.