NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

SJC-12599

PEMBROKE HOSPITAL  vs.  D.L.


Plymouth.     January 10, 2019. - May 23, 2019.

Present:  Gants, C.J., Lenk, Gaziano, Lowy, Budd, Cypher, &
Kafker, JJ.



Incompetent Person, Commitment.  Practice, Civil, Commitment of
    mentally ill person.  Moot Question.  Words, "Discharge."


    Civil action commenced in the Plymouth Division of the
District Court Department on January 6, 2016.

    A motion to dismiss was heard by Michael A. Vitale, J.

    The Supreme Judicial Court granted an application for
direct appellate review.


    Devorah Anne Borenstein, Committee for Public Counsel
Services, for the defendant.
    Michael T. Porter for the plaintiff.
    Lester D. Blumberg, Special Assistant Attorney General, &
Jeffrey Mackenzie, for Department of Mental Health, amicus
curiae, submitted a brief.
    Kathryn Rucker, Robert D. Fleischner, Nicole Holbrook,
Phillip Kassel, Stanley Eichner, & Richard Glassman, for Mental
Health Legal Advisors Committee & others, amici curiae,
submitted a brief.

BUDD, J.  "The right of an individual to be free from physical restraint is a paradigmatic fundamental right."  Matter of E.C., 479 Mass. 113, 119 (2018), quoting Commonwealth v. Knapp, 441 Mass. 157, 164 (2004).  General Laws c. 123 governs involuntary civil commitment due to mental illness, and thus may curtail that freedom, but only in particular circumstances, and by way of specified procedures designed to protect due process rights.  See Williams v. Steward Health Care Sys., LLC, 480 Mass. 286, 292 (2018), citing O'Connor v. Donaldson, 422 U.S. 563, 576 (1975) (statute "written in recognition of psychiatric patients' fundamental right to liberty").  See also Matter of N.L., 476 Mass. 632, 636 (2017) (recent legislative reforms to G. L. c. 123 intended "to afford individuals more due process in civil commitment and medical treatment hearings than had been available previously" [citation omitted]).

Here, D.L. was held involuntarily at Pembroke Hospital (Pembroke) on a temporary basis due to mental illness.  Upon the denial of Pembroke's petition to extend D.L.'s confinement, Pembroke allegedly "discharged" D.L., but simultaneously detained and transported him without his permission to a second hospital for another mental health evaluation.  This second evaluation ultimately led to an order for involuntary confinement for a period of up to six months.  In this appeal we are called upon to interpret the meaning of the word "discharge"

as that term is used in G. L. c. 123 to determine whether an individual may be said to have been "discharged" from a facility if his or her liberty has not been restored.  We conclude that the answer is no.[1]

1.  <u>Statutory framework for civil commitments</u>.  General Laws c. 123, § 12, which provides for the temporary emergency involuntary restraint and commitment of persons with mental illness in certain circumstances, is the "primary route" for the involuntary civil commitment of an individual.  <u>Guardianship of Doe</u>, 391 Mass. 614, 621 (1984).  Section 12 (<u>a</u>) provides in pertinent part:

> "[any mental health professional qualified under G. L. c. 112] who, after examining a person, has reason to believe that failure to hospitalize such person would create a likelihood of serious harm by reason of mental illness may restrain or authorize the restraint of such person and apply for the hospitalization of such person for a [three]-day period at [an authorized facility]."[2]

---

[1] We acknowledge the amicus briefs submitted by the Department of Mental Health, and by the Mental Health Legal Advisors Committee, the Disability Law Center, and the Center for Public Representation.

[2] "Likelihood of serious harm" is defined as:  "(1) a substantial risk of physical harm to the person himself as manifested by evidence of, threats of, or attempts at, suicide or serious bodily harm; (2) a substantial risk of physical harm to other persons as manifested by evidence of homicidal or other violent behavior or evidence that others are placed in reasonable fear of violent behavior and serious physical harm to them; or (3) a very substantial risk of physical impairment or injury to the person himself as manifested by evidence that such person's judgment is so affected that he is unable to protect himself in the community and that reasonable provision for his

Once an individual is detained under § 12 (a), he or she may be admitted for care and treatment if a designated physician of the facility "determines that failure to hospitalize such person would create a likelihood of serious harm by reason of mental illness." G. L. c. 123, § 12 (b). Commitment pursuant to § 12 (b) may last only three business days. G. L. c. 123, § 12 (a) and (d); Mass. R. Civ. P. 6 (a), 365 Mass. 747 (1974). By the end of that period of time, the individual must be discharged unless the facility files a petition for continued involuntary commitment pursuant to G. L. c. 123, §§ 7-8, or the person chooses to stay voluntarily. G. L. c. 123, § 12 (d).

An individual who has been admitted involuntarily to a hospital pursuant to § 12 (b) is entitled to legal representation and may request an emergency hearing in District Court if he or she has reason to believe that the admission is the result of an "abuse or misuse" of § 12. G. L. c. 123, § 12 (b). See Newton-Wellesley Hosp. v. Magrini, 451 Mass. 777, 784 (2008) (Magrini).

A court order is required if a facility seeks to hold an individual involuntarily beyond the temporary emergency commitment allowed by § 12. The facility must file such a

protection is not available in the community." G. L. c. 123, § 1.

petition within the initial three-day period and must allege that "the failure to hospitalize would create a likelihood of serious harm by reason of mental illness."  G. L. c. 123, § 7 (a).  The court shall order the commitment of an individual only if it finds that the individual is mentally ill, that his or her discharge would create an imminent likelihood of serious harm, and there is no less restrictive alternative to continued involuntary hospitalization.  G. L. c. 123, § 8 (a).  Commonwealth v. Nassar, 380 Mass. 908, 917 (1980).  Such findings must be made beyond a reasonable doubt.  Superintendent of Worcester State Hosp. v. Hagberg, 374 Mass. 271, 276 (1978).  See Aime v. Commonwealth, 414 Mass. 667, 678 n.14 (1993).[3]

Once the petition is filed, the court is to schedule a hearing within five days, with certain exceptions, G. L. c. 123, § 7 (c), after which the court ordinarily must render its decision on the petition within ten days, G. L. c. 123, § 8 (c).  While the outcome of the petition is pending, the facility may continue the involuntary commitment.  G. L. c. 123, § 12 (d).  Periods of commitment under § 8 may last for periods of six to twelve months -- depending on the circumstances -- before

---

[3] The burden of proof for civil commitment in Massachusetts is higher than the Federal standard, which requires at least "clear and convincing" evidence for civil commitment.  See Aime v. Commonwealth, 414 Mass. 667, 678 & n.14 (1993); Addington v. Texas, 441 U.S. 418, 433 (1979).

additional judicial review is required. G. L. c. 123, § 8 (d). Under G. L. c. 123, § 9 (b), "[a]ny person" may also file a written application for a patient's discharge prior to the expiration of an order for commitment.

2. Background. The material facts are undisputed. On December 16, 2015, D.L. was committed involuntarily to Pembroke under § 12 (b) based on suicidal statements that he had made. Pembroke timely filed a petition for continued involuntary commitment pursuant to G. L. c. 123, §§ 7-8, alleging that D.L. had not been "eating or drinking for several days," and he would die in the following one to two weeks without intervention.

At the hearing, a Pembroke doctor testified that D.L. had been unresponsive, minimally cooperative with staff, and selectively mute during his stay. The doctor further testified that D.L. had been refusing food and medication, and that he was drinking no more than a minimal amount of fluids. The doctor expressed concern that "if this continues [D.L.] will completely stop eating, drinking, and die." Finally, the doctor testified that, in his opinion, there was no less restrictive setting appropriate and available for D.L. On cross-examination, however, the doctor agreed that progress notes indicated that D.L. had been eating and drinking "when hungry." After hearing the testimony and arguments, the District Court judge denied the petition, finding that Pembroke had not met its burden.

In the hours following the denial of the petition to continue D.L.'s involuntary commitment, staff at Pembroke were unable to locate a family member willing to house D.L. Thereafter, Pembroke determined that, because D.L. was psychotic and his family would not take him in, D.L. needed "continued inpatient psychiatric care for his own safety in the context of worsening psychosis." Pembroke asserts that it then discharged D.L.[4] but, without allowing him to leave the hospital, Pembroke arranged to have D.L. transported without his permission to South Shore Hospital (South Shore) for a second evaluation pursuant to § 12 (a).[5] After being examined by a different doctor at South Shore, D.L. was returned to Pembroke in the early morning of December 31, 2015, this time pursuant to South Shore's § 12 (a) application. Once back at Pembroke, D.L. was rehospitalized involuntarily under § 12 (b).

Pembroke thereafter timely filed a second petition for D.L.'s continued commitment pursuant to G. L. c. 123, §§ 7-8. D.L. moved to dismiss the petition, claiming that the District Court lacked jurisdiction to rule on it because of the "abuse or

_____

[4] The record does not contain information regarding the steps Pembroke took to "discharge" D.L.; however, as discussed infra, because D.L. did not regain his liberty he was not properly discharged.

[5] In the § 12 (a) application, Pembroke alleged the same facts that had been alleged in the commitment petition that had been denied that same day.

misuse" of the § 12 procedure that occurred prior to the filing of the petition. The judge denied the motion to dismiss and, after a hearing, ordered D.L.'s commitment to Pembroke for a period of up to six months.[6] D.L. appealed from the denial of his motion to dismiss and from the District Court judge's order of commitment to the Appellate Division of the District Court Department, which affirmed the District Court judge's rulings and also found that there was no abuse of the involuntary commitment procedure under G. L. c. 123, § 12. We granted D.L.'s application for direct appellate review.

3. Discussion. Pembroke does not dispute that it had no authority to hold D.L. after its first petition to continue D.L.'s involuntary confinement was denied. See Thompson v. Commonwealth, 386 Mass. 811, 816 (1982) ("once the conditions justifying confinement cease to exist, the State's power to confine terminates, and the person is entitled to be released"). See also G. L. c. 123, § 6 (a).[7] Pembroke argues, however, that

[6] The District Court judge found that there were "several intervening acts" between the denial of the first petition and the subsequent § 12 commitments; those intervening events included the new information that no one in D.L.'s family was willing to take him home from the hospital, and that an independent evaluation occurred at South Shore.

[7] General Laws c. 123, § 6 (a), provides in relevant part: "No person shall be retained at a facility . . . except under the provisions of [§§ 10(a); 12 (a)-(c); 13; 16(e); and 35] or except under a court order or except during the pendency of a

it followed proper procedure by discharging D.L. and simultaneously arranging for his involuntary transportation to and psychiatric examination by South Shore pursuant to § 12.

D.L. contends that Pembroke did not discharge him within the meaning of G. L. c. 123, and that the continued restraint was an "abuse or misuse" of § 12. Thus, he argues, that everything that took place subsequently, including the second petition for continued confinement, was tainted, and therefore, his motion to dismiss the petition was improperly denied. We review questions of statutory interpretation de novo. See Meikle v. Nurse, 474 Mass. 207, 209 (2016), quoting Commerce Ins. Co. v. Commissioner of Ins., 447 Mass. 478, 481 (2006).

a. Mootness. As an initial matter, Pembroke argues that because D.L. is no longer in the hospital's custody, this case is moot.[8] We disagree. Wrongfully committed patients have a surviving interest in establishing, after discharge, that the orders by which they were committed were unlawful, "thereby, to a limited extent, removing a stigma from [their] name and record." See Matter of F.C., 479 Mass. 1029, 1029-1030 (2018), quoting Seney v. Morhy, 467 Mass. 58, 62 (2014). Even without

---

petition for commitment or to the pendency of a request under [§ 14]."

[8] D.L. was discharged from Pembroke prior to the argument before the Appellate Division.

D.L.'s surviving interest in the matter, it is well established that cases involving the confinement of mentally ill persons present "'classic examples' of issues that are capable of repetition, yet evading review," which thus warrant appellate review even after the confinement ends. See Magrini, 451 Mass. at 782, quoting Acting Supt. of Bournewood Hosp. v. Baker, 431 Mass. 101, 103 (2000). Thus, we exercise our discretion to address the merits of this case.

b. "Discharge" within the context of G. L. c. 123. The question whether Pembroke discharged D.L., as staff members of the facility claim to have done, depends on what the Legislature meant by the term "discharge" within the context of G. L. c. 123. The statute does not define "discharge"; however, the relevant dictionary definition is "to set at liberty: release from confinement, custody or care." Webster's Third New International Dictionary 644 (1993). See Commonwealth v. Campbell, 415 Mass. 697, 700 (1993), quoting Commonwealth v. Zone Book, Inc., 372 Mass. 366, 369 (1977) ("We derive the words' usual and accepted meaning from sources presumably known to the statute's enactors, such as their use in other legal contexts and dictionary definitions"). See Commonwealth v. Scott, 464 Mass. 355, 358 (2013) (term with multiple meanings may have only one within context of statute).

"Our primary duty is to interpret a statute in accordance with the intent of the Legislature."  See Pyle v. School Comm. of S. Hadley, 423 Mass. 283, 285 (1996).  See also Boston Police Patrolmen's Ass'n v. Boston, 435 Mass. 718, 719-720 (2002), and cases cited.  With that in mind, we note that G. L. c. 123 was "written in recognition of psychiatric patients' fundamental right to liberty," which is curtailed considerably by an involuntary commitment.  Williams, 480 Mass. at 292, and cases cited.  See Magrini, 451 Mass. at 785 (involuntary commitment implicates "significant liberty interests").  The multiple procedural protections built into the statute, discussed supra, seek to balance an individual's involuntary restraint against his or her right to be free from confinement.[9]

Reading the statute in light of the legislative intent to protect the patient's right to be "free from physical restraint" (citation omitted), see Matter of E.C., 479 Mass. at 119, it is clear that a facility "discharges" an individual under G. L. c. 123 only when that individual is set at liberty from involuntary restraint, and not when released from care as

---

[9] In fact, the modern version of the statute reflects a fundamental shift in our law toward the destigmatization of mental illness and the "elevation of the dignity of [human beings]," which warrants constitutional protection against involuntary restraint.  See Flaschner, The New Massachusetts Mental Health Code -- A Magna Carta or a Magna Maze, 56 Mass. L. Q. 49, 50 (1971).

happened here. Otherwise, the protections of the statute would be impermissibly weakened, if not rendered meaningless. See also 2A N.J. Singer & S. Singer, Statutes and Statutory Construction § 45:11 (7th ed. 2010, rev. April 2014) ("The fact that one among alternative constructions involves serious constitutional difficulties is reason to reject that interpretation in favor of a reasonable, constitutional alternative, if available"), and cases cited.

c. Application. Because we hold that "discharge" under c. 123 requires that an individual regain his liberty, we conclude that, contrary to Pembroke's assertion, D.L. was not discharged within the meaning of the statute after the initial petition pursuant to §§ 7 and 8 was denied. Instead, Pembroke continued to confine D.L. following the denial of the petition until transferring him to South Shore in order to recommence the § 12 commitment process. Pembroke then admitted him for a second time as an involuntary patient under § 12, and filed a second petition seeking a further confinement pursuant to §§ 7 and 8.

As justification for its actions, Pembroke points to the fact that after the first petition had been denied and D.L. was supposed to be released, staff members were unable to secure housing for D.L. with family members. See 104 Code Mass. Regs. § 27.09(1)(a), (b) (2018). Id. at § 27.09(1)(b) ("A facility

shall make every effort to avoid discharge to a shelter or the street").[10] Because they determined that, given D.L.'s condition, he would be unsafe in a homeless shelter, they continued to confine him and arranged for a different hospital to make an independent determination under § 12. Although we have no reason to believe that Pembroke acted in bad faith -- to the contrary, the staff seem to have moved quickly out of genuine concern for D.L.'s well-being -- we nonetheless cannot conclude that Pembroke was in compliance with the strict requirements of G. L. c. 123. As the District Court judge initially had found that D.L.'s mental illness did not create a "likelihood of serious harm," the fact that D.L. did not have a place to live upon his release was not a proper ground for Pembroke to involuntarily restrain him. See Commonwealth v. Blake, 454 Mass. 267, 277-278 (2009) (Ireland, J., concurring) (confinement must cease once fact finder determines standard for civil commitment is not met).[11]

---

[10] This regulation, which requires "[a] facility [to] make every effort to avoid discharge to a shelter or the street" plainly should not be read to mean that a facility should go so far as to involuntarily commit an individual if accommodations cannot be secured upon discharge. See 104 Code Mass. Regs. § 27.09(1)(b). Instead, the facility is to "take steps to identify and offer alternative options to a patient and shall document such measures, including the competent refusal of alternative options by a patient, in the medical record" (emphases added). See id.

[11] Had the judge found that discharging the patient would create a likelihood of serious harm, he would have gone on to

     In essence, Pembroke substituted its judgment for that of
the judge in contravention of G. L. c. 123.  This constituted an
"abuse or misuse" of the authority afforded to facilities and
health care professionals under § 12.[12]  As a result, the
subsequent examinations by South Shore and Pembroke were
improper, as was Pembroke's second petition under §§ 7 and 8.
The fact that South Shore independently made a § 12
determination and admission is of no moment; nor is the fact
that a different District Court judge came to a different
conclusion regarding the second petition for continued
confinement.  Each of those events occurred as a direct result
of Pembroke having failed to restore D.L.'s liberty.[13]

---

determine whether a less restrictive alternative to involuntary
confinement at the facility existed (such as releasing the
patient to the care of his family).  In such a case, if the
patient's family members were not available to care for the
patient, that fact would constitute a changed circumstance
warranting judicial reconsideration of the petition.

     [12] As D.L. correctly points out, "[i]f not required to
comply with a court ruling denying its commitment petition, a
hospital is free to engage in serial involuntary admissions
under § 12 by supplanting judicial determinations with medical
opinion.  This is fully at odds with the legal process our
Legislature adopted in 1970 that only allows civil commitments
based on proof of mental illness and likelihood of serious harm.
G. L. c. 123, §§ 7 (c), 8 (a)."  See Sullivan v. Brookline, 435
Mass. 353, 360 (2001) ("statutory language should be given
effect consistent with its plain meaning and in light of the aim
of the Legislature unless to do so would achieve an illogical
result").
     [13] We note that requiring that an individual's liberty be
restored prior to being restrained and readmitted pursuant to
§ 12 (a) imposes neither time nor distance prerequisites between

4. <u>Conclusion</u>.  Pembroke failed to discharge D.L. within the meaning of G. L. c. 123 after the denial of its petition to continue D.L.'s confinement; this was a violation of the statute.  See G. L. c. 123, § 6 (<u>a</u>).  In addition, Pembroke's § 12 (<u>a</u>) application to South Shore for evaluation and subsequent readmission and involuntary confinement of D.L. was an "abuse or misuse" of § 12.  See G. L. c. 123, § 12 (<u>b</u>); <u>Magrini</u>, 451 Mass. at 784.  Finally, because D.L. was not held lawfully under § 12 (<u>b</u>), the District Court did not have jurisdiction to rule on the petition for civil commitment pursuant to G. L. c. 123, §§ 7 and 8.  For these reasons, the decision and order of the Appellate Division denying D.L.'s motion to dismiss is reversed.  The order of civil commitment pursuant to §§ 7 and 8 is vacated.

<u>So ordered</u>.

---

admissions.  However, an involuntary readmission pursuant to § 12 must be based on new information that was unavailable to the judge during the previous petition hearing.  Here, as the judge denied the first petition -- finding D.L. not to be a danger to himself or others -- Pembroke needed new information pertaining to D.L.'s dangerousness in order to readmit him properly pursuant to § 12.