NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

SJC-12844

MASSACHUSETTS GENERAL HOSPITAL  vs.  C.R.


Suffolk.     January 9, 2020. - April 14, 2020.

Present:  Gants, C.J., Lenk, Gaziano, Lowy, Budd, Cypher,
& Kafker, JJ.


Mental Health.  Incompetent Person, Commitment.  Practice,
    Civil, Commitment of mentally ill person.  Due Process of
    Law, Commitment.



    Petition for involuntary civil commitment filed in the
Central Division of the Boston Municipal Court Department on
August 16, 2018.

    The case was heard by Robert J. McKenna, Jr., J.

    The Supreme Judicial Court granted applications for direct
appellate review.


    Emily Kanstroom Musgrave for the petitioner.
    Karen Owen Talley, Committee for Public Counsel Services,
for the respondent.
    The following submitted briefs for amici curiae:
    Steven J. Schwartz, Robert Fleischner, Kathryn L. Rucker,
Anna Krieger, Phillip Kassel, Jennifer Honig, & Tatum A.
Pritchard for Center for Public Representation & others.
    Lester D. Blumberg, Special Assistant Attorney General,
Jeffrey MacKenzie, & John DiPietrantonio for Department of
Mental Health.

Matthew E. Sroczynski for Massachusetts Health & Hospital Association & others.

Thomas F. Schiavoni, pro se.

KAFKER, J.   After exhibiting signs of a mental illness at Logan Airport, C.R. was brought to the emergency department (ED) of Massachusetts General Hospital (MGH) by police pursuant to G. L. c. 123, § 12 (a).   She was detained at the ED for five days while an appropriate placement was sought for her in a psychiatric facility pursuant to G. L. c. 123, § 12 (b).   C.R. was ultimately admitted to a psychiatric facility, which in this case was a separate unit at MGH.   The day after she was admitted to a psychiatric facility, but six days after she was initially brought to the ED, MGH filed a petition for commitment pursuant to G. L. c. 123, §§ 7 and 8.

The issue on appeal focuses on the time allowed to perform the different activities required under G. L. c. 123, § 12 (a) and (b).   During the § 12 (a) period, the patient is preliminarily evaluated and an application is made to an appropriate psychiatric facility.   The statute contains no specific time period for § 12 (a).   In contrast, § 12 (b) provides for a more thorough evaluation of the patient that must be conducted within three days.   The issue is whether the three-day window under G. L. c. 123, § 12 (b), begins running when the patient is initially restrained under G. L. c. 123, § 12 (a), as

the Appellate Division of the Boston Municipal Court concluded, such that MGH's petition was untimely, or whether that three-day period only begins when a patient is admitted to a facility for purposes of § 12 (b). We conclude that the activity governed by G. L. c. 123, § 12 (a), is separate from the three-day involuntary hospitalization period established under G. L. c. 123, § 12 (b), and therefore reverse the decision of the Appellate Division of the Boston Municipal Court. The three-day period under G. L. c. 123, § 12 (b), is necessary to fully evaluate the patient, and was not intended by the Legislature to be shortened by the § 12 (a) time period.

We also conclude, however, that the time encapsulated by G. L. c. 123, § 12 (a), was intended by the Legislature to be an expedited emergency process, during which time the patient would be stabilized and preliminarily evaluated by a qualified medical professional, who would then apply for the hospitalization of the patient at a facility authorized to further evaluate and care for such patient. Due to many complicating factors discussed infra, however, the time for application to and acceptance by an authorized facility has extended well beyond original expectations, particularly for the most vulnerable patients. The record and briefing, however, also establish that there is a concerted effort by the executive branch to address this crisis, including the establishment of specific time frames

for hospitals and insurance providers to initiate escalation steps for placement searches within the § 12 (a) period, and ongoing communication between the executive branch and the Legislature regarding this effort.  Furthermore, the Legislature has not yet amended G. L. c. 123, § 12 (a), despite the unexpected enlargement of time spent in EDs, often referred to as "ED boarding," even as the Legislature has amended other provisions of the statute to tighten other time frames.  Absent constitutional violations, we will not impose such a time deadline, when the Legislature has chosen not to do so.

Although her argument is primarily statutory, C.R. suggests that her rights to due process may be violated if § 12 (a) is not time defined.  Based on the record before us, we discern no constitutional violation with regard to C.R.'s confinement given the difficulty of finding her an appropriate placement.  We also consider the larger questions of the constitutionality of § 12 (a) and ED boarding times more generally to be premature at this time, as this case was not brought as a class action or a declaratory judgment, nor did C.R. contend that § 12 (a) was unconstitutional on its face.  Our decision to decline to consider these additional constitutional questions is also informed and influenced by the urgent efforts being made on the part of the executive branch to specify and shorten permissible ED boarding times, and its active engagement with the

Legislature. As we perform our responsibilities of judicial review, we recognize and show due respect for the diligent efforts made by the other branches of government responsible for performing the functions we are reviewing, particularly when they involve complicated policy choices. Finally, we do, however, strongly encourage the Legislature to identify a § 12 (a) time deadline to clarify the statute and avoid future constitutional difficulties and to do so as expeditiously as possible.[1]

1. Background. C.R. was admitted to MGH's ED on Friday, August 10, 2018, after experiencing symptoms of a mental illness at Logan Airport. C.R. was agitated and screaming at the airport, which led to police restraining her and bringing her to the ED pursuant to G. L. c. 123, § 12 (a).[2] After arriving at the hospital, C.R. was agitated and was yelling, screaming, and threatening staff. C.R. was administered antipsychotic

---

[1] We acknowledge the amicus briefs submitted by the Department of Mental Health; Center for Public Representation, Disability Law Center, and Mental Health Legal Advisors Committee; Massachusetts Health & Hospital Association, Massachusetts Association of Behavioral Health Systems, Massachusetts Psychiatric Society, and Massachusetts College of Emergency Physicians; and Thomas F. Schiavoni.

[2] The facts giving rise to the police officer's initiation of the G. L. c. 123, § 12 (a), application process are not a part of the record before us; nor is the G. L. c. 123, § 12 (a), application that was filled out that same day by a doctor at MGH, as MGH was unable to locate these documents.

medication, secluded, and put in four-point restraints. Medical professionals at MGH decided to apply for C.R.'s hospitalization at an authorized psychiatric facility pursuant to G. L. c. 123, § 12 (b). Doctors concluded that C.R. required a private facility room due to the level of her agitation when she presented at the ED and throughout her stay there. For that reason, C.R. remained in the ED at MGH until a bed in a private facility room became available on Wednesday, August 15, 2018.

On that day, C.R. was admitted to MGH's inpatient psychiatric department (Blake 11), which is a psychiatric unit licensed by the Department of Mental Health (DMH).[3] A new G. L. c. 123, § 12 (a), application was completed on August 15 by the same doctor who authorized C.R.'s admission to the facility that day. When she arrived at the facility, C.R. remained agitated; she shouted and gestured in a threatening manner. On August 16, MGH filed a petition for commitment pursuant to G. L. c. 123, §§ 7 and 8. In the petition, MGH stated that, "because of her florid mania and delusional thinking, [C.R.] appears unable to take care of her basic needs in the community."

Also on August 16, C.R. filed a pro se petition for an emergency hearing pursuant to G. L. c. 123, § 12 (b), which a

---

[3] Unlike Blake 11, MGH's ED is not a DMH-licensed facility. To obtain a license from DMH, a facility must meet certain requirements and submit an extensive application, as discussed infra. See 104 Code Mass. Regs. § 27.03(10)(c) (2019).

judge in the Boston Municipal Court denied without a hearing. Counsel was appointed for C.R. and filed a second request for an emergency hearing on August 17. An emergency hearing was held on August 20. The court denied C.R.'s request for immediate release.

On August 23, C.R., through counsel, filed a motion to dismiss MGH's petition for lack of jurisdiction, arguing that MGH filed its petition for commitment outside the three-day window provided under G. L. c. 123, § 12. The court denied the motion on the same day at a hearing on MGH's petition for C.R.'s commitment pursuant to G. L. c. 123, §§ 7 and 8. At that hearing, the court heard testimony from Dr. Stuart Beck, a staff psychiatrist at Blake 11. Beck articulated C.R.'s symptoms for the court and testified that C.R. suffers from bipolar affective disorder type 1. He also explained how patients brought to the hospital's ED under G. L. c. 123, § 12 (a), often wait for an available bed before being involuntarily admitted to a facility pursuant to § 12 (b), and why there are often multiple § 12 (a) forms for the same patient before he or she is admitted:

> "[W]hen people come into the emergency room or they're on the medical floor and there's a thought about them going to an inpatient [psychiatric] unit, they institute a [§ 12 (a) application]. They [(the patients)] can sit there for days to weeks . . . . [S]ometimes there's new information that comes up or the clinical situation changes and the previous [§ 12 (a) application] doesn't seem relevant or appropriate and they [(MGH medical professionals)] sometimes write new ones."

When individuals in need of inpatient psychiatric hospitalization wait in hospital EDs for extended periods of time, as described supra, it is known as ED boarding. Executive Office of Health and Human Services & Executive Office of Housing and Economic Development, Expedited Psychiatric Inpatient Admission Protocol 2.0 (Nov. 14, 2019) (EPIA 2.0). See Matter of the Detention of D.W. v. Department of Social & Health Servs., 181 Wash. 2d 201, 204 (2014) ("Such overcrowding-driven detentions are often described as 'psychiatric boarding'").

After denying C.R.'s motion to dismiss the petition, the judge allowed MGH's petition for commitment and ordered that C.R. be civilly committed for a period not to exceed two weeks. C.R. timely filed her notice of appeal on August 29, appealing from both the denial of her motion to dismiss and the court order involuntarily committing her pursuant to G. L. c. 123, §§ 7 and 8.

On September 5, 2019, the Appellate Division of the Boston Municipal Court reversed the lower court's denial of C.R.'s motion to dismiss the petition for lack of jurisdiction. The Appellate Division acknowledged that G. L. c. 123, § 12 (a), "is silent on whether the three day detention period begins when a patient arrives at an emergency department, or if the period

does not begin until a patient is admitted to a psychiatric facility."  The court nevertheless concluded that the three-day detention period under § 12 (b) "begins when a patient arrives at an emergency department or a psychiatric facility."  Because the facility superintendent in this case filed the G. L. c. 123, §§ 7 and 8, petition one day beyond the three-day period under this calculus, MGH failed to timely file the petition and was required to discharge C.R. at that point under G. L. c. 123, § 12 (b).[4],[5]  MGH filed a timely notice of appeal, and we granted both parties' applications for direct appellate review.

2.  G. L. c. 123, § 12.  General Laws c. 123, § 12, governs the emergency restraint, evaluation, care, and hospitalization of persons posing a risk of serious harm due to mental illness. It contains multiple sections with different purposes, procedures, and evaluators, and, most importantly for our purposes, different time deadlines.  Those deadlines are tightly tailored to the tasks at hand.  Although time is of the essence

---

[4] For the reasons stated in Pembroke Hosp. v. D.L., 482 Mass. 346, 351 (2019), we address the issue of the timeliness of the filing even though C.R. had been discharged from the hospital before the order of the Appellate Division had been issued.  We do so given the stigma associated with involuntary commitment and because the issue of the timeliness of the filing is of the classic type capable of repetition yet evading review. See id.

[5] The Appellate Division did not address the merits, as opposed to the timeliness, of the commitment petition, and that issue is not before us on appeal.

in all sections, different time periods are necessary to accomplish the different purposes of each section. At issue in the instant case is the time allowed to perform the tasks set out in § 12 (a). Unfortunately, this is one section without a specific deadline.

Section 12 (a) provides:

"[Any mental health professional qualified under G. L. c. 112] who, after examining a person, has reason to believe that failure to hospitalize such person would create a likelihood of serious harm by reason of mental illness may restrain or authorize the restraint of such person and apply for the hospitalization of such person for a [three]-day period at a public facility or at a private facility authorized for such purposes by [DMH]. If an examination is not possible because of the emergency nature of the case and because of the refusal of the person to consent to such examination, the physician, qualified psychologist, qualified psychiatric nurse mental health clinical specialist or licensed independent clinical social worker on the basis of the facts and circumstances may determine that hospitalization is necessary and may apply therefore."

The statute also provides that, in an emergency situation where a qualified medical professional or a clinical social worker is unavailable, "a police officer, who believes that failure to hospitalize a person would create a likelihood of serious harm by reason of mental illness may restrain such person and apply for the hospitalization of such person for a [three]-day period at a public facility or a private facility authorized for such purpose by the department." Id. The statute further provides:

"Whenever practicable, prior to transporting such person, the applicant shall telephone or otherwise communicate with

a facility to describe the circumstances and known clinical history and to determine whether the facility is the proper facility to receive such person and also to give notice of any restraint to be used and to determine whether such restraint is necessary."

Id.

A "facility" is defined by G. L. c. 123, § 1, as "a public or private facility for the care and treatment of mentally ill persons, except for the Bridgewater State Hospital."  DMH further defines "facility" as a "[DMH]-operated hospital, community mental health center with inpatient unit, or psychiatric unit within a public health hospital; a [DMH]-licensed psychiatric hospital; a [DMH]-licensed psychiatric unit within a general hospital; or an intensive residential treatment program for adolescents that is either designated as a facility under the control of [DMH] or licensed by [DMH]."  104 Code Mass. Regs. § 27.02 (2019).

Facilities are heavily regulated for the particular mental health services they provide.  To obtain a license from DMH, a facility must submit an extensive application including written plans for delivery and supervision of clinical services by qualified personnel, its plan for assuring adequate and appropriate staffing, and plans for physical adaptations, such as provision of single-occupancy bedrooms when necessary for patients with high behavioral acuity, such as the patient in the instant case.  See 104 Code Mass. Regs. § 27.03(10)(c) (2019).

Facilities are required to have sufficient trained staff and to maintain staffing to meet the operational capacity of the facility at levels deemed appropriate by DMH. 104 Code Mass. Regs. § 27.03(11) (2019).

DMH has also identified specific qualifications for facility directors, physicians, and nurse leaders to be hired at licensed facilities. Id. DMH conducts a survey at least every two years of each licensed facility to ensure each facility complies with Massachusetts law and DMH regulations. 104 Code Mass. Regs. § 27.03(20) (2019). Although DMH and these licensed facilities make it their objective to meet the mental health needs of the Commonwealth, as further explained infra, a patient's application and admission into a facility has become an increasingly complicated task.

Once the patient has been transported to a facility for admission, the procedures and time deadlines set out elsewhere in G. L. c. 123, § 12, apply. General Laws c. 123, § 12 (b), states:

> "Only if the application for hospitalization under the provisions of this section is made by a physician specifically designated to have the authority to admit to a facility in accordance with the regulations of [DMH], shall such person be admitted to the facility immediately after his reception. If the application is made by someone other than a designated physician, such person shall be given a psychiatric examination by a designated physician immediately after his reception at such facility. If the physician determines that failure to hospitalize such person would create a likelihood of serious harm by reason

of mental illness he may admit such person to the facility for care and treatment."

A person admitted under § 12 (b) "is entitled to legal representation and may request an emergency hearing in the District Court if he or she has reason to believe that the admission is the result of an 'abuse or misuse' of § 12." Pembroke Hosp. v. D.L., 482 Mass. 346, 348 (2019), quoting G. L. c. 123, § 12 (b).  The court must hold that hearing on the day the request is filed with the court, or not later than the next business day.  G. L. c. 123, § 12 (b).

The statute further provides that "[a] person shall be discharged at the end of the three day period unless the superintendent applies for a commitment under the provisions of [§§ 7 and 8] of this chapter or the person remains on a voluntary basis."[6]  G. L. c. 123, § 12 (d).  See 104 Code Mass. Regs. § 27.09(7) (2019).  The time periods prescribed or allowed

---

[6] General Laws c. 123, § 7 (a), permits the superintendent of a facility to petition the court for the commitment of a patient at the facility if the superintendent "determines that the failure to hospitalize would create a likelihood of serious harm by reason of mental illness."  The statute requires a hearing on these petitions; when a superintendent brings a commitment petition for a patient initially hospitalized pursuant to G. L. c. 123, § 12 (b), to extend the involuntary commitment period, the G. L. c. 123, § 7, hearing must be commenced within five days from when the superintendent filed the petition.  G. L. c. 123, § 7 (c).  General Laws c. 123, § 8, governs court orders for commitment petitions filed under G. L. c. 123, § 7.

under G. L. c. 123, § 12, are computed pursuant to Mass. R. Civ.
P. 6, 365 Mass. 747 (1974).[7]  G. L. c. 123, § 12 (e).

The three-day time period established in § 12 (b) was
intended for qualified medical professionals to evaluate a
patient and make a determination as to what treatment that
patient may or may not require, and how long that prospective
treatment may last.  The three-day window carved out by the
Legislature in § 12 (b) provides a facility with the appropriate
time frame to assess and monitor a patient, and to determine
whether commitment pursuant to a court order is appropriate for
that patient.  Shortening this time period risks jeopardizing

---

[7] Rule 6 (a) of the Massachusetts Rules of Civil Procedure,
365 Mass. 747 (1974), provides:

> "In computing any period of time prescribed or allowed by
> these rules, by order of court, or by any applicable
> statute or rule, the day of the act, event, or default
> after which the designated period of time begins to run
> shall not be included.  The last day of the period so
> computed shall be included, unless it is a Saturday, a
> Sunday, or a legal holiday, in which event the period runs
> until the end of the next day which is not a Saturday, a
> Sunday, or a legal holiday.  When the period of time
> prescribed or allowed is less than [seven] days,
> intermediate Saturdays, Sundays, and legal holidays shall
> be excluded in the computation."

Thus, in computing the three-day period for purposes of G. L.
c. 123, § 12, we have recognized that the day on which the
person is admitted to a facility does not count toward the
three-day time limit of that person's hospitalization under
G. L. c. 123, § 12 (b).  See Newton-Wellesley Hosp. v. Magrini,
451 Mass. 777, 780 n.6 (2008); 104 Code Mass. Regs. § 25.04
(2016).

the careful evaluation of patients requiring treatment, and limits the ability of qualified medical professionals to accurately determine whether the "failure to hospitalize [the patient] would create a likelihood of serious harm by reason of mental illness."  G. L. c. 123, § 12 (b).  As explained by the ad hoc committee tasked with reviewing G. L. c. 123, § 12, prior to a 2000 legislative amendment, the Legislature "spent a great deal of time in seeking to determine what would constitute the most efficient and effective time lines to accomplish the purposes of the statute while minimizing the length of any involuntary hospitalization periods for the patients involved." District Court Committee on Mental Health and Retardation, Report of the Ad Hoc Committee to Review G. L. c. 123, § 12, at 2 (Oct. 21, 1997).  It also concluded that "a three business day period is necessary to make a valid clinical determination of a patient's need for continued psychiatric hospitalization" under G. L. c. 123, § 12 (b).  Id. at 4.

Shortening this time period in any way would not only violate the express terms of the statute, but would contradict the statutory purpose.  The determination here is difficult and designed to protect the interests of both the patient and the public.  It must be done thoroughly and deliberately.  See, e.g., Williams v. Steward Health Care Sys., 480 Mass. 286, 293 (2018).

After a patient has been evaluated during the three-day time period established under § 12 (b), other provisions of the statute come into play that also contain particular time deadlines.  If the superintendent of a facility moves for commitment of the patient before the end of the three-day time period, a court generally has five days to commence a hearing. G. L. c. 123, § 7 (c).  The court then generally has ten days from the completion of the hearing to render its decision. G. L. c. 123, § 8 (c).  Under this framework, a patient may thus be hospitalized in a licensed facility for as long as eighteen days before a decision on his or her commitment is made.  G. L. c. 123, §§ 7 (c), 8 (c), 12 (b).

A comprehensive reading of G. L. c. 123, § 12 (a) and (b), thus demonstrates that these subsections describe different tasks by different evaluators applying different standards.  For example, a qualified medical professional or clinical social worker, or in emergency situations a police officer, may restrain an individual and apply for his or her hospitalization if the medical professional or clinical social worker "has reason to believe that failure to hospitalize such person would create a likelihood of serious harm by reason of mental illness" (emphasis added).  G. L. c. 123, § 12 (a).  To admit a patient, however, a physician qualified and designated to admit patients to a psychiatric facility must determine "that failure to

hospitalize such person <u>would create a likelihood</u> of serious harm by reason of mental illness" (emphasis added).  G. L. c. 123, § 12 (<u>b</u>).  See <u>Newton-Wellesley Hosp</u>. v. <u>Magrini</u>, 451 Mass. 777, 779 & n.4 (2008) (determination of whether "failure to hospitalize such person would create a likelihood of serious harm by reason of mental illness" is "quite different from the 'reason to believe' standard . . . required for restraint and application for hospitalization" [citation omitted]); <u>Reida</u> v. <u>Cape Cod Hosp</u>., 36 Mass. App. Ct. 553, 556 (1994) ("The admitting physician has the role of determining whether, in fact, a failure to hospitalize <u>would</u> create a likelihood of serious harm, in contrast to the applying physician, whose function is only to determine whether there is reason to believe that such may be the case").[8]

In sum, G. L. c. 123, § 12 (<u>a</u>) and (<u>b</u>), reflects distinct phases that should not be collapsed into one.  We also respect the legislative determination that three days may be required to correctly perform the § 12 (<u>b</u>) evaluation process.  That leaves unresolved the question of how long the Legislature allowed the

---

[8] Relatedly, a court may only commit an individual pursuant to G. L. c. 123, §§ 7 and 8, if it finds beyond a reasonable doubt that a person has a mental illness, that his or her discharge would create an imminent likelihood of serious harm, and that there is no less restrictive alternative to the continued involuntary hospitalization.  <u>Pembroke Hosp</u>., 482 Mass. at 348-349.

§ 12 (a) process to last, and whether such process as currently employed violates constitutional due process standards.

Where a statute "is simply silent on a particular issue," -- as is the case here with the undefined time period of restraint under § 12 (a) -- "we interpret the provision in the context of the over-all objective the Legislature sought to accomplish" (quotations and citation omitted).  Wing v. Commissioner of Probation, 473 Mass. 368, 373 (2015).

With regard to the period of restraint of patients under G. L. c. 123, § 12 (a), our review of the statutory language and legislative history reveals that the Legislature envisioned an expedited, emergency process that took no longer than was necessary to transport the patient to an ED, conduct a preliminary evaluation necessary to determine whether further evaluation and hospitalization in a licensed facility was necessary, and apply to such a facility for admission.[9]  What the Legislature apparently failed to foresee was the increasing

---

[9] The statute also contemplates that a patient may be brought directly to a licensed facility.  G. L. c. 123, § 12 (a) ("Whenever practicable, prior to transporting such person, the applicant shall telephone or otherwise communicate with a facility to describe the circumstances and known clinical history and to determine whether the facility is the proper facility to receive such person and also to give notice of any restraint to be used and to determine whether such restraint is necessary").

complexity and difficulty of the application and admission process.

3. ED boarding and the reality of the admissions process. The most significant problem the Legislature failed to foresee when it contemplated a short period of restraint under G. L. c. 123, § 12, was the difficulty of placing patients with high behavioral acuity or significant comorbidities. See Commissioners of Insurance, Mental Health, and Public Health, Bulletin 2018-01, Prevention of Emergency Department Boarding of Patients with Acute Behavioral Health and/or Substance Use Disorder Emergencies (Jan. 3, 2018) (Bulletin 2018-01). Although facilities are required to have a plan in place to provide single occupancy bedrooms when necessary to address behavioral acuity in their patient population, see 104 Code Mass. Regs. § 27.03(10)(c), it remains especially difficult to find placement for certain patients, i.e., minor patients, or patients with comorbidities requiring extensive care outside of psychiatric care, exhibiting dangerous behavior, or otherwise exhibiting behavior requiring a private room, like the plaintiff here. See Bulletin 2018-01, supra. In addition to a shortage of beds or single-occupancy rooms, there also might be a shortage of psychiatrists or other physicians who staff inpatient facilities with resources for these types of patients. Where there might be an open bed, there may not always be the

appropriate staff to treat the patient.  Insurance company approvals further complicate this process.  See, e.g., Bulletin 2018-01, supra at 2-3.  See also G. L. c. 176O, § 16 (b).

These problems have unexpectedly extended the period of time necessary to apply to a facility for admission.  Thus, there is some disconnect between the intent of the Legislature to provide for a short period of restraint, preliminary evaluation, and application to an appropriate facility pursuant to § 12 (a), and the reality medical professionals face when trying to find a placement for psychiatric patients, particularly the most vulnerable ones.

Although there is disagreement about the time permitted for ED boarding, the record presented to this court reveals no realistic alternative to ED boarding itself.  A physician, qualified mental health professional, or, in an emergency, a police officer has made a preliminary determination that there is reason to believe that failure to hospitalize such person would create a likelihood of serious harm by reason of mental illness.  G. L. c. 123, § 12 (a).  Thus, releasing the patient poses a risk of serious harm to the patient or the public. Compare Pembroke Hosp., 482 Mass. at 353 (after judge found patient's mental illness did not create likelihood of serious harm, inappropriate to confine him).  Taking the patient into police custody is clearly a worse alternative.  EDs are thus the

only identified alternative, and one clearly contemplated by the Legislature, albeit for a short period of time.[10]

The EDs themselves have no choice in the matter, and no incentive to prolong the patient's stay there.  EDs are legally obligated to accept patients with emergency medical conditions -- including emergency psychiatric conditions -- and are not able to turn patients away in anticipation that ED staff will not find a facility bed right away.  See 42 C.F.R. § 489.24(d)(1) (2013) (mandating that hospitals must provide treatment or ensure appropriate transfer of patient who arrives with emergency medical condition).  As explained in the record and briefing, ED boarding causes overcrowding and strains hospital resources.

---

[10] We note that the Legislature appeared to be aware when enacting G. L. c. 123, § 12, that patients are often first brought to EDs before they are admitted to facilities.  See, e.g., Minority Report of the Ad Hoc Committee to Review G. L. c. 123, § 12, at 1 n.1 (Oct. 21, 1997) (identifying "the role of the police in restraining and transporting persons to hospitals"); Testimony of Robert D. Fleischner to Subcommittee on Involuntary Commitment and Mental Health Services, at 3 (Oct. 21, 1997) ("after being seen by an emergency service team[], individuals may be admitted to a private hospital").  See also National Center for State Courts, Guidelines for Involuntary Civil Commitment, 10 Mental & Physical Disability L. Rep. 409, 445 (1986) (guideline allowing police officers to leave after screening application of patient is complete "protect[s] against misuse of the no-decline policy and 'dumping' of troublesome individuals at the emergency room door").  However, our review of the legislative history suggests that the practice of ED boarding was not expressly contemplated by the Legislature at the time.

Nothing in the record suggests that hospitals have any incentive to perpetuate ED boarding unnecessarily; rather, they have every incentive to place a psychiatric patient requiring treatment in a facility as soon as possible, and are trying to do so. They are also understandably concerned about simply releasing such patients, as they fear being sued if harm befalls such patients or the public. Cf. Williams, 480 Mass. at 293-297 (discussing potential theories of liability of hospitals and their personnel subsequent to release of psychiatric patients who present likelihood of serious harm). At the very least, EDs ensure that patients in psychiatric crisis are being cared for and can do no physical harm to themselves or to others during the application process. Matter of E.C., 479 Mass. 113, 119 (2018) ("The provisions of G. L. c. 123 balance the rights of and protections for incompetent persons with the Commonwealth's interest in protecting the public from potentially dangerous persons who may be unable to control their actions because of their mental condition" [quotation and citation omitted]).

The record also demonstrates that the executive branch of the Commonwealth is actively engaged in addressing the length of time of ED boarding, imposing numerous deadlines during the ED boarding process. See Testimony of Commissioner of Mental Health, Joint Hearing of the House and Senate Committees on Ways and Means (Mar. 11, 2019) (Commissioner Testimony). As a part

of its initiative, the Commissioner of Insurance, the Commissioner of Mental Health, and the Commissioner of Public Health issued Bulletin 2018-01, supra.  Among other things, Bulletin 2018-01 -- subsequently updated by Bulletin 2019-08 (Nov. 13, 2019) -- described its expedited psychiatric inpatient admission protocol (EPIA), aimed at reducing ED boarding times.

The EPIA provides that twenty-four hours "is the maximum threshold for initiating escalation steps to obtain placement for a patient who is boarding in an ED."  EPIA 2.0, supra at 1. If placement has not been identified within twenty-four hours from when a patient arrives to the ED, the ED must make a formal request for assistance to the insurance carrier, which must help ED staff members gauge availability in facilities when a patient requires accommodation for his or her admission under G. L. c. 123, § 12 (b).  Id. at 3.  The insurance carrier must respond within two hours of the submission of a request for assistance during normal business hours; when a request for assistance is made outside of normal business hours, the carrier must acknowledge receipt of the request no later than the morning of the next calendar day after the request is made.  Id.  If a patient has been in the ED for ninety-six hours, the ED and the insurance carrier must notify DMH that the patient has not yet been placed.  Id. at 5.  The protocols give detailed "play-by-play" information and a timeline of what steps must be taken by

the insurance carrier to assist in identifying a placement for the patient, and are evidence of the extensive efforts DMH and other entities have made to solve problems and shorten ED boarding times with the resources they have available.[11]

The record before us also shows that the Legislature has been made aware of ED boarding times and the actions DMH has taken to address them since at least March 2019, when the Commissioner of Mental Health (commissioner) testified at a joint hearing of the House and Senate Committees on Ways and Means. During that testimony, the commissioner discussed the initiative to improve ED boarding times. Commissioner Testimony, supra at 8. According to the commissioner, the EPIA "establishes clear steps and responsibility when placement [of a patient] has not been achieved in a reasonable period of time

---

[11] Relatedly, DMH has promulgated regulations making it unlawful for a facility to create "exclusion criteria that would result in the refusal to admit a patient." 104 Code Mass. Regs. § 27.03(5)(c) (2019). A facility may only deny admission if it would result in the facility operating beyond its operational capacity or its licensed capacity. 104 Code Mass. Regs. § 27.05(3) (2019). See Bulletin 2019-08, supra at 1 ("inpatient psychiatric facilities are expected to admit all [G. L. c. 123, § 12 (b),] patients, so long as they have the capacity [an available bed] and the capability [ability to meet the clinical needs of the patient]"). Facilities operating below their licensed capacities must specify the reasons why and provide a plan to meet staffing requirements to operate at full licensed capacity. 104 Code Mass. Regs. § 27.03(11) (2019). When denying admission, a facility must show that, "despite its best efforts, it is unable to accommodate the additional capacity." 104 Code Mass. Regs. § 27.05(3)(b).

and a protocol for escalating cases to senior clinical leadership at insurance carriers, inpatient psychiatric units, and ultimately to DMH in order to achieve placements for the most difficult to place patients." Id. The commissioner acknowledged that EDs were acting to reduce boarding times, but that, during the first twelve months of the EPIA's implementation, DMH received 481 requests for assistance for patients who had waited at least ninety-six hours.[12] Id.

It is thus apparent to us that the Legislature understands that the period of restraint and application under § 12 (a) makes at least temporary ED boarding a necessity for at least the most difficult-to-place patients. However, the Legislature has not yet amended G. L. c. 123, § 12 (a), to reflect that the application process is taking more time than what was originally envisioned because of a number of complex developments regarding mental health care. The March 2019 testimony of the

---

[12] As the EPIA and DMH bulletins make clear, those for whom it is most difficult to find a bed in a facility are often those the most in need of one. See EPIA 2.0, supra at 1. This is why, if we were to apply the three-day time limit in G. L. c. 123, § 12 (b), to patients in ED boarding -- as the Appellate Division has done -- the individuals most vulnerable in the Commonwealth would be the ones released after just three days. Such vulnerable individuals include children; the poor, including the homeless; and those with special needs, high behavioral acuity, or intellectual disabilities. These patients will decidedly not benefit from being released from an ED after just three days before receiving the treatment and evaluation they need.

commissioner provided to us in the record illustrates that the Legislature has become aware of this problem, as well as the ensuing concerted effort by the executive branch, through DMH, to address this problem by enlisting all relevant actors, including medical professionals, EDs, hospitals, and insurance carriers. The Legislature has also been informed that DMH has established specific time frames that initiate escalation steps to be taken by hospitals and insurance carriers. For example, DMH has identified the time period of ninety-six hours after a patient has entered an ED as the time when the ED and insurance carrier must request assistance from DMH in placing a patient.[13] See EPIA 2.0, supra at 5.

Despite this effort, the Legislature has not yet taken any action to impose a specific time period on § 12 (a) as it further evaluates the complex problem of ED boarding. It has not done so, even though it has amended G. L. c. 123, § 12, multiple times over the decades to, among other things, revise deadlines in the commitment process without ever specifying the length of time a person may be restrained under § 12 (a). See,

---

[13] This also makes clear that, contrary to the decision of the Appellate Division in this case, neither the Legislature nor DMH understands the period of restraint under § 12 (a) to be the same as, or collapsed into, the three-day period of evaluation and hospitalization under § 12 (b), as ninety-six hours exceeds the three-day time period established in § 12 (b), yet was tacitly accepted by the Legislature when DMH issued its protocols.

e.g., St. 2000, c. 249, §§ 4-6 (reducing initial period of evaluation and hospitalization without court order from ten to four days); St. 2004, c. 410, § 2 (further reducing same period to three days); St. 2010, c. 278, § 1 (adding social workers to list of individuals who may restrain patient if they have reason to believe patient presents risk of harm).

We are also aware that the issue of ED boarding is being actively considered in the current legislative session.  The Senate passed a mental health bill on February 13, 2020, that includes an amendment to that bill that would put a forty-eight hour cap on the amount of time patients younger than twenty-two years old may spend in an ED before admission to a facility.  A bill is, of course, not law, but is nevertheless reflective of the Legislature's active consideration of the problem.  As explained infra, such consideration informs our approach to the constitutional questions ED boarding raises.

In these circumstances, absent constitutional violations, we will not impose a specific time deadline into a statute where no such deadline has been included.  In so concluding, we recognize that the time period for the application and acceptance process has been greatly enlarged beyond original expectations through complex developments.  However, we also recognize that the executive branch is actively engaged in addressing the problem, imposing numerous time deadlines that

trigger escalation steps in the process of placing patients, and the Legislature is aware of the problem and has not yet sought to impose its own more specific time requirements, even in an area that it has closely monitored and for which it has tightened time deadlines in the past.

4. Constitutional questions. "The right of an individual to be free from physical restraint is a paradigmatic fundamental right," Pembroke Hosp., 482 Mass. at 347, quoting Matter of E.C., 479 Mass. at 119, and those who are involuntarily committed, even on a temporary basis, experience "a massive curtailment of their liberty" (quotation and citation omitted), Newton-Wellesley Hosp., 451 Mass. at 784. We have previously recognized that the Legislature, in enacting and subsequently amending G. L. c. 123, § 12, "intended to protect the individual's due process rights by minimizing the length of time for which he or she could be involuntarily committed prior to judicial review." Matter of N.L., 476 Mass. 632, 636-637 (2017) ("It is illogical that the Legislature would shorten the period for conducting [civil commitment and medical treatment] hearings and have it inure to the detriment of the individual's due process right to prepare a meaningful defense"). In this vein, we have previously recognized that G. L. c. 123 provides for tight time limits, "and any violation of those limits would risk running afoul of due process protections." Matter of E.C., 479

Mass. at 122 n.8.  See Hashimi v. Kalil, 388 Mass. 607, 610 (1983) ("That the statute imposes a restraint on liberty also compels the conclusion that the time limit on the holding of the hearing goes to the essence of the public duty").

We do not, however, decide constitutional questions unnecessarily or prematurely.  See Beeler v. Downey, 387 Mass. 609, 613 n.4 (1982) (this court must "fulfill[] its duty to avoid unnecessary decisions of serious constitutional issues," and "[t]he question whether this court should use its power to declare a statute unconstitutional is of wide public importance and extends far beyond the bounds of the instant case").  The instant case is also not a class action or a declaratory judgement action.  C.R.'s primary argument is statutory. Although in making that statutory argument, she contends that there must be an outer constitutional time limit to § 12 (a), she does not argue that § 12 (a) is unconstitutional on its face, nor does she fully develop the argument that § 12 (a) is unconstitutional as applied to her.  In this context, we decide only the constitutional questions necessary to resolve this case and to provide required guidance to the governmental and nongovernmental actors involved in resolving the ED boarding crisis.

First, we recognize the grave impairment of liberty for C.R.  C.R. was deemed to be so agitated as to require four-point

restraints.  While in that condition, she was restrained in an ED for five days while qualified medical personnel applied for her admission to a licensed psychiatric facility.  The application process was complicated by the fact that she was deemed to require a private room in a facility.  During this time period she had no right to counsel or other procedural protections beyond the original preliminary determination by a qualified medical professional that there was "reason to believe that failure to hospitalize [C.R.] would create a likelihood of serious harm by reason of mental illness."  See G. L. c. 123, § 12 (a).  Her restraint here for five days clearly raises constitutional concerns.

We also emphasize that the important constitutional liberty interests at stake require that the involuntary restraint pursuant to § 12 (a), including the time period allowed for that restraint, must be narrowly tailored to serve a compelling governmental interest.  The law must also be the least restrictive means available to vindicate that interest.  See Matter of a Minor, 484 Mass. 295, 309 (2020) ("Laws that directly infringe on fundamental rights, such as liberty from constraint, are subject to strict scrutiny.  To pass the strict scrutiny standards, the [law] must be narrowly tailored to further a legitimate and compelling governmental interest and be the least restrictive means to vindicate that interest"

[quotation and citations omitted]); Commonwealth v. Weston W., 455 Mass. 24, 35 (2009).  See also Pembroke Hosp., 482 Mass. at 347 ("General Laws c. 123 governs involuntary civil commitment due to mental illness, and thus may curtail that freedom, but only in particular circumstances, and by way of specified procedures designed to protect due process rights").

Here, that compelling interest is the patient's health and safety and the safety of the public.  The restraint must be narrowly tailored to protect that compelling patient and public safety interest, employing the least restrictive means possible to accomplish that objective.  Restraint here is only justified long enough to find an appropriate facility to evaluate the patient.  Any unnecessary delay is unconstitutional.  The suitability of the location of that restraint must also be considered.

In the instant case, however, there is no indication in the record that the period of restraint was any longer than was necessary to find the patient an appropriate facility for evaluation.  Her intense agitation and the requirement of finding her a single room lengthened the process.  Nothing in the record indicates any lack of effort on the part of MGH to identify an appropriate placement for C.R.  Nor did MGH have any incentive to keep her in the ED any longer than was necessary.  Finally, no suitable, less restrictive location than an

emergency room was identified for the restraint and application process to occur.  In these circumstances, we discern no constitutional due process violation in the instant case.

We also recognize that the record indicates that the boarding time here was not exceptional.  Rather, the record describes a widespread problem of ED boarding exceeding ninety-six hours.  We recognize that the scale and scope of the problem may very well present a different set of constitutional questions.  That being said, we follow the precautionary principle of not deciding constitutional questions unnecessarily or prematurely for a number of interrelated reasons in the instant case.

Our precautionary approach is also informed and influenced by the concerted, ongoing efforts on the part of the Commonwealth to address the ED boarding crisis, including the time frames established by DMH for hospitals and insurance carriers to escalate steps in the placement process pursuant to the EPIA, and the active engagement of the executive branch with the Legislature to attempt to address the problem.  The issue of widespread ED boarding has thus generated a concerted response by the Commonwealth.  As we perform our responsibilities of judicial review, we must also recognize and demonstrate due respect for the diligent efforts made by the other branches of government responsible for performing the functions we are

reviewing, particularly when they involve complicated policy choices.  Hancock v. Commissioner of Educ., 443 Mass. 428, 457 (2005) (Marshall, C.J., concurring) ("Here, the independent branches of government have shown that they share the court's concern, and that they are embracing and acting on their constitutional duty . . .").  See Sunstein, Foreword:  Leaving Things Undecided, 110 Harv. L. Rev. 4, 38 (1996) ("[A] broad, early ruling may have unfortunate systemic effects.  It may prevent the kind of evolution, adaption, and argumentative give-and-take that tend to accompany lasting social reform").  For this combination of reasons, we consider it premature to decide these larger constitutional questions at this time.  See McDuffy v. Secretary of the Executive Office of Educ., 415 Mass. 545, 621 (1993) ("No present statutory enactment is to be declared unconstitutional," but court will continue to monitor planned legislative and executive actions).

We do, however, strongly encourage the Legislature to identify a time period capping the time of ED boarding to clarify the over-all § 12 (a) time deadline and avoid future constitutional difficulties, and to do so as expeditiously as possible.  Cf. Jean W. v. Commonwealth, 414 Mass. 496, 499 & n.3 (1993) (Liacos, C.J., concurring) (announcing court's intention to abolish public duty rule "at the first available opportunity after the conclusion of the 1993 session of the Legislature" and

"inviting the Legislature to consider the forthcoming change in decisional law, and to make any preparations for the change that it deems appropriate"); Whitney v. Worcester, 373 Mass. 208, 210-213 (1977) (urging Legislature to take action to abrogate sovereign immunity and refine formulation and principles stressed in court's opinion). Establishing such a cap within a reasonable time frame is necessary to ensure the protection of the important liberty interests at stake.

5. Conclusion. We reverse the decision of the Appellate Division dismissing the petition as untimely. The time period a patient is restrained pursuant to G. L. c. 123, § 12 (a), is distinct from the time period a patient may be hospitalized pursuant to § 12 (b). The three-day period under G. L. c. 123, § 12 (b), is necessary to properly evaluate the patient, and was not intended by the Legislature to be shortened by the activities undertaken during the § 12 (a) period. Although the § 12 (a) time period for application to and acceptance by an authorized facility has extended beyond the Legislature's original expectations, the Legislature has not yet chosen to include a specific deadline despite its recognition of the issue. Absent demonstrated constitutional violations, we will not impose such a specific requirement ourselves. As applied to C.R., we conclude that the statute did not violate due process, as the § 12 (a) period of confinement was no longer than

necessary given the difficulty of finding her an appropriate placement.  We also conclude that any additional constitutional ruling regarding § 12 (a) or ED boarding times generally is premature in the instant case, which has not been brought as a facial challenge to the statute or as a class action or request for declaratory judgment.  Our decision that any further constitutional ruling is premature is informed and influenced by our recognition that the executive branch has engaged in a concerted effort to address and resolve the crisis, including developing time frames for hospitals and insurance providers to initiate escalation steps for facility placement searches during the § 12 (a) period, and so informed and engaged the Legislature, which continues to evaluate the problem.  We do, however, encourage the Legislature to include a time deadline for the § 12 (a) evaluation process as expeditiously as possible to clarify the statute and ensure the protections of the important liberty interests at stake.

So ordered.